**UNITED STATES of America, Plaintiff,**

v.

**Joseph Paul FRANKLIN, Defendant.**

**No. F Cr 82–16.**

United States District Court,
N. D. Indiana,
South Bend Division.

Aug. 30, 1982.

Christina McKee, Asst. U. S. Atty., Fort Wayne, Ind., Daniel F. Rinzel, Barry F. Kowalski, Criminal Section, Civ. Rights Div., Dept. of Justice, Washington, D. C., for plaintiff.

J. Frank Kimbrough, Fort Wayne, Ind., for defendant.

Lawrence Gunnels, Samuel Fifer, Charles C. Post, Reuben & Proctor, Chicago, Ill., Joseph S. Van Bokkelen, Goldsmith, Goodman, Ball & Van Bokkelen, Highland, Ind., Richard W. Cardwell, Ober, Symmes, Cardwell, Voyles & Zahn, Indianapolis, Ind., for intervenor newsgathering organizations.

## MEMORANDUM AND ORDER

SHARP, Chief Judge.

### I.

The defendant, Joseph Paul Franklin, was charged with violating the civil rights of Vernon E. Jordan in Fort Wayne, Indiana on May 29, 1980 by attempting to shoot him. The case was tried before this judge in South Bend, Indiana and the trial concluded on August 17, 1982. The trial involved a number of unique security problems to the court, its personnel, witnesses, and the defendant himself. The trial was the subject of much media attention, both national and local, with an involved personal coverage by reporters from a considerable number of news gathering organizations.

Alternate jurors were excused at approximately 12:25 P.M. on August 17, 1982 with the following remarks:

THE COURT: There are a couple of things. First of all, I thank you. I'm a little surprised that we didn't have to use one of you. It's rare when we have a trial go this long that we don't have to use one alternate for one reason or another. That didn't happen.

I trust, first of all, it's been interesting for you. It's been an unusual trial. A somewhat historic one, I suppose, in some respects. Otherwise, you have served the public well by being here.

It may well have been that we would have needed to use you. We didn't. I frankly think that the rule ought to be modified so at least you can be sitting in there listening. And I see that you agree with that. But that isn't the rule. That is the rule in State Courts in Indiana. It is not the rule in our courts, and I have to follow the rules even when I don't agree with them.

But the most important thing I want to say to you is that I now enjoin all participants in this trial, and all others, as I always do, from attempting to interrogate any of the four of you. And the same injunction will be applicable to the 12 jurors when they return.

I understand that there are those who disagree with this almost violently. But as long as I have anything to do with running trials it will be so. And that is I do not think and never have, that jurors should be subject to anybody questioning them when they leave the performance of their duties. They can't question me; I'm a Judge. You're also judges, and they can't question you. And I do not permit it.

You will not be accosted in the hallways by anyone; lawyers, participants, or others, in attempting to interrogate how you might be deciding this case if you were in there rather than out here.

So I excuse you with that admonition, and I'm most appreciative. I'm the only one that is permitted under procedures to thank you. I do thank you on behalf of all of us, and on behalf of the Court. You may leave this way (indicating).

During the course of deliberations the Court received a written communication from one of the representatives of one news gathering organization which was covering the trial. That written communication is now filed of record in this case and incorporated by reference herein.

Also, during deliberations one representative of one of the news gathering organizations covering the trial informed personnel of the court that he intended to make oral objections to the court's proceedings during the course of taking the verdict. With that knowledge at hand and before the jury was brought into the court room to announce its verdict, this Court made the following observations and orders:

THE COURT: Bring in the Defendant. There are some procedures this Court normally follows with regard to the receipt of the verdict. And they are fundamentally no different in this case than in literally hundreds of other cases that this Court does try.

First of all, I now instruct the United States Marshal and his staff to seal the courtroom with reference to anyone coming or going until the Jury has been in, the verdict received, and the Jury has been discharged. The room is about two-thirds of the way full. It's a public proceeding. Anyone else that wants to get in will get in. You will get out when we release you and you can get to the phones or whatever all at one time. I do not intend to tolerate half of the audience leaving right in the middle of the proceedings. It's too important for that. That's one item.

Item two, there are only two groups of people in this room that have any standing besides the Jury and the Court to participate in this proceedings. One group is the three attorneys for the Government. The other person is the

Defendant's counsel. No one else will be permitted to in anyway involve himself in this proceeding. This Court will see that the procedure is followed with whatever means is at its hands to do so.

The orders that this Court will lay down are the same orders that this Court has laid down literally hundreds of times in every single jury case that this Court has tried, except one, and that's when I forgot.

A verdict of not guilty was returned at approximately at 8:55 P.M. on August 17, 1982. After the receipt of the verdict this Court made the following comments and orders to the jury in discharging them:

THE COURT: It is the normal practice of this Court to enjoin those who are participants in this trial, all others, from attempting to interrogate you about the contents of your deliberations or the reasons for your verdict. And that is now done in this case.

There are reasons for that. Simply stated, you will be called back for other cases. There are other good policy reasons, in my opinion, and in the opinions of judges through the Federal System in reported cases, for that injunctions.

You will not be accosted or questioned as you go to your cars or as you go to your homes tonight by the participants in this trial or by anyone else. The marshals have been instructed to see to that. And they have been instructed by me.

You have served the public faithfully in this case. You have performed your duties within the law and the evidence. And I now thank you and release you.

On August 20, 1982 the Chicago Tribune Company and others, hereinafter called petitioners, filed a written motion to reconsider and vacate order concerning communication with jury members. The same was immediately set for hearing on September 9, 1982 at 1:30 P.M. with a request to brief the standing issue. As indicated orally in open court on the 26th day of August, 1982

at the hearing on said petition at that time September 9, 1982 represented the first time that this Court had an opportunity to hear this matter considering the numerous matters that were then scheduled by this Judge in this Court in both South Bend, at the Indiana State Prison, and in Lafayette, Indiana.

Soon thereafter the Court's schedule changed and the aforesaid petition was set for hearing on August 30, 1982 at 1:30 o'clock P.M. Thereafter, because the Court's calendar at the Indiana State Prison was shorter than expected the aforesaid hearing was rescheduled and actually held about 4:00 o'clock P.M. on the 26th day of August, 1982.

On August 23, 1982 the petitioners filed a proceeding for a Writ of Mandamus in the United States Court of Appeals for the Seventh Circuit and the same was assigned their cause number 82–2325. On August 23, 1982 the Court of Appeals entered the following order:

On consideration of the "EMERGENCY PETITION FOR WRIT OF MANDA-MUS" filed herein on August 23, 1982, by counsel for the petitioners,

IT IS ORDERED that Honorable Allen Sharp, United States District Court Judge for the Northern District of Indiana, respondent herein, file a response to said petition by 12:00 noon, Friday, August 27, 1982.

This order was not received by this Judge until August 26, 1982 although the contents thereof were read orally to this Judge by a law clerk from the Court of Appeals while this Judge was handling prisoner litigation at the Indiana State Prison on August 23, 1982. Thereafter, on August 24, 1982, in the aforesaid action, the Court of Appeals entered the following order:

By order dated August 23, 1982, this Court requested that the respondent, Judge Allen Sharp, file a response to the "EMERGENCY PETITION FOR WRIT OF MANDAMUS" filed herein on August 23, 1982 by counsel for the petition-

ers. At that time, the district court had scheduled its hearing for September 9, 1982 on the petitioners' "MOTION TO RECONSIDER AND VACATE THE INJUNCTION ORDER" prohibiting the jurors from discussing *United States v. Franklin.*

This Court, *sua sponte,* modifies its earlier order dated August 23, 1982 in the following respect:

IT IS ORDERED that the respondent, Judge Allen Sharp, either hold a hearing to resolve the petitioners' "MOTION TO RECONSIDER AND VACATE THE INJUNCTION ORDER" by 5:00 p.m., August 27, 1982, or vacate the injunction order entered on August 17, 1982.

Said order of August 24, 1982 was not received by this Judge until August 25, 1982, although the contents thereof were made known to this Judge on either August 24 or August 25, 1982. Thereafter, on August 26, 1982 the Court of Appeals entered the following order:

Upon consideration of respondent's "MOTION TO CONTINUE" filed on August 26, 1982, said motion is DENIED. This Court, however, modifies its order of August 24, 1982, as follows:

1. Respondent, Judge Allen Sharp shall commence the hearing to resolve the petitioners' "MOTION TO RECONSIDER AND VACATE THE INJUNCTION ORDER" by August 27, 1982. If the hearing is not completed by the time available on August 27, 1982, it may be continued on Monday, August 30, 1982.

2. If the hearing must be continued, *it is further ordered* that a judgment must be rendered in this matter by 5:00 p.m. Monday, August 30, 1982, with proper notification to this court.

The aforesaid order of August 26, 1982 was not received by this Judge until August 27, 1982, although the contents thereof were orally read to this Judge by a member of the Clerk's staff of the Court of Appeals just prior to hearing conducted by this Court at 4:00 P.M. on August 26, 1982.

In accord with the mandate said hearing was continued until August 30, 1982 at 2:00 o'clock P.M. for final decision.

In his dissenting opinion in *New York Times v. U. S.,* 403 U.S. 713, 754, 91 S.Ct. 2140, 2161, 29 L.Ed.2d 822 (1971), Justice Harlan commented:

With all respect, I consider that the Court has been almost irresponsibly feverish in dealing with these cases.

Both the Court of Appeals for the Second Circuit and the Court of Appeals for the District of Columbia Circuit rendered judgment on June 23. The New York Times' petition for certiorari, its motion for accelerated consideration thereof, and its application for interim relief were filed in this Court on June 24 at about 11 a.m. The application of the United States for interim relief in the *Post* case was also filed here on June 24 at about 7:15 p.m. This Court's order setting a hearing before us on June 26 at 11 a.m., a course which I joined only to avoid the possibility of even more peremptory action by the Court was issued less than 24 hours before. The record in the *Post* case was filed with the Clerk shortly before 1 p.m. on June 25; the record in the *Times* case did not arrive until 7 or 8 o'clock that same night. The briefs of the parties were received less than two hours before argument on June 26.

This frenzied train of events took place in the name of the presumption against prior restraints created by the First Amendment. Due regard for the extraordinarily import and difficult questions involved in these litigations should have led the Court to shun such a precipitate timetable. In order to decide the merits of these cases properly, some or all of the following questions should have been faced: [list of seven issues set forth]

\* \* \* \* \* \*

These are difficult questions of fact, of law, and of judgment; the potential consequences of erroneous decision are enor-

mous. The time which has been available to us, to the lower courts, and to the parties has been wholly inadequate for giving these cases the kind of consideration they deserve. It is a reflection on the stability of the judicial process that these great issues—as important as any that have arisen during my time on the Court—should have been decided under the pressures engendered by the torrent of publicity that has attended these litigations from their inception.

Forced as I am to reach the merits of these cases, I dissent from the opinion and judgments of the Court. Within the severe limitations imposed by the time constraints under which I have been required to operate, I can only state my reasons in telescoped form, even though in different circumstances I would have felt constrained to deal with the cases in the fuller sweep indicated above. (Burger, C. J. and Blackmun, J., concur).

The recited record in this case indicates a like "feverish" element and a similar "frenzied train of events" in a case involving a fundamentally important interplay between rights under the First Amendment and Article III judicial authority. This Court is

likewise operating "within the severe limitations imposed by time constraints." Here those time constraints were imposed by a higher judicial body whose authority to do so is not here questioned. It has, however, placed the severest burden on this Court to deal with the issues fully and effectively in the time allotted.

A major premise for all that follows is that in this case the defendant was acquitted. Whether the reasoning or result here announced would apply to a criminal case verdict where there was a conviction is reserved for another day, another case, on another record. These issues also deserve to be developed in a mature, deliberate and careful fashion.

The term "jury" used in this order shall include alternate jurors as well.

## II.

The record in this case represents a very important and fundamental interplay between the free press and free speech clauses of the First Amendment[1] to the Constitution and the exercise of judicial power and authority under Article III[2] of the Constitution of the United States.

1. Amendment I.

 Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

2. Article III.

 SECTION 1. The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

 SECTION 2. The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party; to Controversies between two or more States;—between Citizens of different States;—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

 In all Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be a Party, the supreme Court shall have original Jurisdiction. In all other Cases before mentioned, the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make.

 The trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.

The general problems that are involved in post-verdict inquiry into the contents of jury deliberations has been the subject of widespread judicial concern. An example of the same in this court is *United States v. Winters,* 434 F.Supp. 1181 (N.D.Ind.1977), *aff'd,* 582 F.2d 1152 (7th Cir. 1978) cert. den., 439 U.S. 936, 99 S.Ct. 333, 58 L.Ed.2d 332 (1978). In that case this court stated at page 1183:

> This Court is very much concerned of counsel interrogating jurors after a verdict has been reached whether that counsel for the United States of America or for a defendant. That practice has been the subject of considerable concern in other federal judicial quarters. See *Bryson v. U. S.,* 238 F.2d 657 (9th Cir. 1956). *Northern Pacific Ry. Co. v. Mely,* 219 F.2d 199 (9th Cir. 1954); *U. S. v. Miller,* 284 F.Supp. 220 (D.Conn.1968); *U. S. v. Crosby,* 294 F.2d 928, 950 (2d Cir. 1961), cert. den. 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962).

On affirming *Winters,* the Court of Appeals stated "On the contrary, we see no reason to doubt that the trial court 'has power to bring post-verdict interrogation of jurors under his control' *Miller v. United States,* 403 F.2d 77, 82 (2d Cir. 1963), and that the procedure adopted by the court in this case was a proper exercise of such supervisory power."

The asserted right of the petitioners and their representatives to engage in post-verdict interrogation of jurors must first be considered in the larger context of the subject of post-verdict interviews with jurors generally. These concerns were stated succinctly by Judge Friendly in *Miller v. United States,* 403 F.2d 77 (7th Cir. 1968) at page 81 as follows:

> Taking the first issue of power, we see no basis for doubting the authority of the trial judge to direct that any interrogation of jurors after a conviction shall be under his supervision. To determine how far such questioning shall be permitted and in what manner it shall be done

requires a weighing of two conflicting desiderata. One is the protection of the defendant's right to a fair trial before "an impartial jury." The other is avoidance of the dangers presented by inquiries that go beyond objective facts: inhibition of jury-room deliberations, harassment of jurors, and increased incidence of jury tampering. Judge Smith observed in *United States v. Crosby,* 294 F.2d 928, 950 (2 Cir. 1961), cert. denied, *Mittleman v. United States,* 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962):

> "There are many cogent reasons militating against post-verdict inquiry into jurors' motives for decision. The jurors themselves ought not be subject to harassment; the courts ought not be burdened with large numbers of applications mostly without real merit; the chances and temptations for tampering ought not be increased; verdicts ought not be made so uncertain. Whenever information erroneously reaches the ears of the jury in open court, the judge's instruction to disregard it may be disobeyed; yet it is not suggested that in such a case the jury ought to be polled as to whether any of them relied on the forbidden knowledge. Even though presumably the jurors themselves know best, the question is determined, as is the question whether an error was prejudicial, on the basis of the nature of the matter and its probable effect on a hypothetical average jury. The same reasons apply when the improper knowledge reached the jury outside the courtroom. It was not error to refuse to examine the jurors as to their mental processes."

Especially because the line between proper and improper inquiry is not easy to draw, see fn. 11, and because the jurors may be in doubt about the proprieties, the judge may well find it better that he control any questioning, whether by having it done in open court, as the Supreme Court directed in *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98

L.Ed. 654 (1954), by allowing depositions where the prosecutor would have an opportunity to object to improper questions, or by passing in advance on the questions sought to be propounded.

Appellant's assertion that a defendant must be free to interrogate jurors after a conviction as he is to interrogate prospective witnesses before trial does not require extended answer. Inquiry of jurors after a verdict seeks to impugn the validity of judicial action on the ground of misconduct of a member of the tribunal. The court has a vital interest in seeing that jurors are not harassed or placed in doubt about what their duty is and that false issues are not created. The argument that interviews by a private investigator involve less harassment than such methods as we have outlined is unconvincing. A juror so interviewed often does not know what he is supposed to do or supposed not to do. Moreover, except when the interview yields nothing, it is only the beginning. In any event such considerations go to the exercise of the power, not to its existence. At least one state, known for the quality of its judicial administration, has adopted a rule that "No attorney shall himself or through any investigator or other person acting for him interview, examine or question any juror with respect to the verdict or deliberations of the jury in any action except on leave of court granted upon good cause shown." N.J.Rev.R. 1:25A. Although the subject is indeed appropriate for court rule, the absence of one does not deprive a judge of power to act in an individual case.

Justice Jackson, writing for the court in *Stein v. New York,* 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953), stated "Nor have the courts favored any public or private post-trial inquisition of jurors as to how they reasoned, lest it operate to intimidate, beset and harass them." 346 U.S. at 178, 73 S.Ct. at 1089.

Other cases in the same vein clearly establish the deep and widespread judicial concern regarding this problem. See, *U. S. v. Hall,* 424 F.Supp. 508 (W.D.Okla.1975); *U. S. v. Dioguardi,* 492 F.2d 70 (2d Cir. 1974); *U. S. v. Franks,* 511 F.2d 25 (6th Cir. 1975); *U. S. v. Handy,* 454 F.2d 885 (9th Cir. 1971); and *U. S. v. Narciso,* 446 F.Supp. 252 (E.D.Mich.1977), and *U. S. v. Driscoll,* 276 F.Supp. 333 (S.D.N.Y.1967).

In *Rakes v. U. S.,* 169 F.2d 739, 745 (D.C.Cir.1948), Judge Prettyman stated:

> The inviolability of the jury room from outside influence of any sort, actual or potential, is a prime necessity in the administration of justice. That unqualified rule requires that if a person, whether on the jury or not knows of such outside influence, or an attempt at it, he must at once report his information to the court. The same rule requires that jurors are not to be harassed in any manner because of a verdict they have rendered. If jurors are conscious that they will be subjected to interrogation or searching hostile inquiry as to what occurred in the jury room and why, they are almost inescapably influenced to some extent by that anticipated annoyance. The courts will not permit that potential influence to invade the jury room. He who makes studied inquiries of jurors as to what occurred there acts at his peril, lest he be held as acting in obstruction of the administration of justice. Much of such conversation and inquiry may be idle curiosity, and harmless, but a searching or pointed examination of jurors in behalf of a party to a trial is to be emphatically condemned. It is incumbent upon the courts to protect jurors from it.

More pointedly to the facts of this case is the statement of Judge Solomon in *Bryson v. U. S.,* 238 F.2d 657 (9th Cir. 1956), at page 665:

> Immediately prior to the receipt of the verdict, the trial judge forbade everyone from communicating with any member of the jury without his permission. Despite this order, a newspaper reporter contacted jurors and reported that at least two

of them expressed uncertainty as to the meaning of "affiliation." Based upon this report, Bryson asked to be relieved of the order so that he could interrogate the jurors on this subject. After a hearing, the court denied his application.

There was no impropriety in the court's original order prohibiting communicating with the jurors. In view of the nature and length of the trial and the wide publicity it received, the order was not only proper but was highly desirable.

This and other courts have condemned the practice of interviewing jurors on the course of their deliberations in the jury room. It is incumbent upon the courts to protect jurors from the annoyance and harassment of such conduct. The order by the Honorable William Mathes, the able and experienced trial judge, was designed to accomplish that purpose and was proper.

*Bryson* was cited and followed in *Simmons First Nat. Bank v. Ford Motor Co.,* 88 F.R.D. 344 (1980).

It is provided at 28 U.S.C. § 1863(b)(8) that the district courts' jury selection plans shall fix the time when names drawn from the qualified jury wheel shall be disclosed to parties and the public, but that the plan may permit a district judge to keep these names confidential in any case where the interests of justice so require. *See United States v. Hoffa,* 367 F.2d 698 (7th Cir. 1966), in which the jury panel list was withheld from all parties until trial. The Court of Appeals for the Second Circuit has upheld a trial judge's decision to withhold the prospective jurors' names and addresses from the parties during the voir dire examination in a sensitive criminal case. *United States v. Barnes,* 604 F.2d 121 (2nd Cir. 1979), *Cf. United States v. Gurney,* 558 F.2d 1202, 1210 n. 12 (5th Cir. 1977), *rehearing denied,* 562 F.2d 1257, *cert. denied sub nom. Miami Herald Publishing Co. v. Krentzman,* 435 U.S. 968, 98 S.Ct. 1606, 56 L.Ed.2d 59 (1978).

There are numerous statutes which are intended to provide a wide variety of protections to jurors serving in a United States District Court. The deliberations are protected by criminal statute. See 18 U.S.C. § 1508.[3] 18 U.S.C. § 245(b)(1)(D)[4] imposes criminal penalties to protect the jury function and 28 U.S.C. § 1875[5] protects such jurors' employment rights.

It is not here contended by either the parties or any counsel for the parties that

---

**3.** The legislative history of 18 U.S.C. § 1508 is most revealing. See, 1956 U.S.Code Cong. and Adm.News, p. 4149:

All of these bills were introduced as a result of the revelation that the deliberations of certain Federal juries had been recorded in connection with a research project financed by a grant from the Ford Foundation. The research project was conducted under the supervision of professors of law from the University of Chicago. That study recorded the private deliberations of Federal juries in six cases which had been heard in the Federal district court at Wichita, Kans. The recording was done without the knowledge of the jurors themselves. However, the recordations were made under a prior agreement of the judge of the court wherein the trials were held. The recording of the actual deliberations, however, was but a part of a much broader study of the university group of the whole jury system.

**4.** 18 U.S.C. § 245. Federally protected activities

(b) Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with—
(1) any person because he is or has been, or in order to intimidate such person or any other person or any class of persons from—
(D) serving, or attending upon any court in connection with possible service, as a grand or petit juror in any court of the United States;
shall be fined not more than $1,000, or imprisoned not more than one year, or both; and if bodily injury results shall be fined not more than $10,000, or imprisoned not more than ten years, or both; and if death results shall be subject to imprisonment for any terms of years or for life.

**5.** 28 U.S.C. § 1875:
§ 1875. **Protection of jurors' employment**
(a) No employer shall discharge, threaten to discharge, intimidate, or coerce any permanent employee by reason of such employee's jury service, or the attendance or scheduled attendance in connection with such service, in any court of the United States.

the injunction against post-verdict interviews of jurors is undue imposition upon them. It was explicitly conceded at the hearing by counsel for the petitioners that this Court had the authority to permanently enjoin counsel and parties from post-jury interrogation. Neither is it an issue in this case that this Court has the authority to enjoin the post-verdict interrogation of jurors on the premises of the United States Court House. Such was also conceded by counsel for the petitioners at the aforesaid hearing.

■ It is fundamental and beyond dispute that the deliberations of a jury are private and confidential and except in a very narrow range of circumstances the court itself is inhibited from inquiring into the contents of such deliberations. See, for example, *Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954), appeal after remand, 348 U.S. 904, 75 S.Ct. 288, 99 L.Ed. 710 (1955); *U. S. v. Howard,* 506 F.2d 865 (5th Cir. 1975); and *Downey v. Peyton,* 451 F.2d 236 (4th Cir. 1971). See also, *Tobias v. Smith,* 468 F.Supp. 1287 (W.D.N.Y.1979), and *Owen v. Duckworth,* 645 F.2d 74 (7th Cir. 1980), *cert. den.,* 452 U.S. 951, 101 S.Ct. 3096, 69 L.Ed.2d 963 (1981), (Burger, C. J. and Rehnquist J. dissenting).

One of the essentials of that process is uninhibited expression of opinion by the deliberating jurors in the jury room. No action should be taken by a court or indeed, by anyone else, either before or *after* a trial that would tend to inhibit this very important aspect of free expression within the jury process.

■ Jurors have a fundamental right to retain as a part of their own privacy the contents of deliberation and this is true in a criminal case whether the deliberations result in a verdict of guilty or a verdict of not guilty.

There is, however, an overlay between the privacy of one juror and that of another. It is very possible for one juror to engage in post-trial violation of the privacy of another.

Although certainly not authoritative, there is a current concern for a post-verdict interrogation of jurors in the popular press. See, for example, "The Juror as Celebrity", *Time,* August 16, 1982, p. 42. This subject was considered by the Judicial Conference of the United States and its Committee on

(b) Any employer who violates the provisions of this section—

(1) shall be liable for damages for any loss of wages or other benefits suffered by an employee by reason of such violation;

(2) may be enjoined from further violations of this section and ordered to provide other appropriate relief, including but not limited to the reinstatement of any employee discharged by reason of his jury service; and

(3) shall be subject to a civil penalty of not more than $1,000 for each violation as to each employee.

(c) Any individual who is reinstated to a position of employment in accordance with the provisions of this section shall be considered as having been on furlough or leave of absence during his period of jury service, shall be reinstated to his position of employment without loss of seniority, and shall be entitled to participate in insurance or other benefits offered by the employer pursuant to established rules and practices relating to employees on furlough or leave of absence in effect with the employer at the time such individual entered upon jury service.

(d) An individual claiming that his employer has violated the provisions of this section may make application to the district court for the district in which such employer maintains a place of business and the court shall, upon finding probable merit in such claim, appoint counsel to represent such individual in any action in the district court necessary to the resolution of such claim. Such counsel shall be compensated and necessary expenses repaid to the extent provided by section 3006A of title 18, United States Code.

(2) [1] In any action or proceeding under this section, the court may award a prevailing employee who brings such action by retained counsel a reasonable attorney's fee as part of the costs. The court may award a prevailing employer a reasonable attorney's fee as part of the costs if the court determines that the action is frivolous, vexatious, or brought in bad faith.

Added Pub.L. 95–572, § 6(a)(1), Nov. 2, 1978, 92 Stat. 2456.

the Operation of the Jury System shared by the Honorable Irving R. Kaufman as reflected in its report of May 1, 1972, which is an indication in itself of the complexity of the problem and the different ways in which judges performing their functions under Article III of the Constitution approach it.

More recently, the Judicial Conference of the United States addressed the problems of Free Press-Fair Trial. See 87 F.R.D. 518.

### III.

This Court is also well aware of and has deep respect for the teachings of Chief Justice Hughes in *Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), decided 51 years ago.

In *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), the Chief Justice, speaking for the court, stated:

It has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally. *Zemel v. Rusk,* 381 U.S. 1, 16–17 [85 S.Ct. 1271, 1280–1281, 14 L.Ed.2d 179] (1965); *New York Times Co. v. United States,* 403 U.S. 713, 728–730 [91 S.Ct. 2140, 2148–2149, 29 L.Ed.2d 822] (1971), (Stewart, J., concurring); *Tribune Review Publishing Co. v. Thomas,* 254 F.2d 883, 885 (CA3 1958); *In the Matter of United Press Assns. v. Valente,* 308 N.Y. 71, 77, 123 N.E.2d 777, 778 (1954). In *Zemel v. Rusk, supra,* the Court sustained the Government's refusal to validate passports to Cuba even though that restriction "render[ed] less than wholly free the flow of information concerning that country." *Id.,* [381 U.S.] at 16 [85 S.Ct. at 1280]. The ban on travel was held constitutional, for "[t]he right to speak and publish does not carry with it the unrestrained right to gather information." *Id.,* at 17 [85 S.Ct. at 1281]. Despite the fact that news gathering may be hampered, the press is regularly ex-

cluded from grand jury proceedings, our own conferences, the meetings of other official bodies gathered in executive session, and the meetings of private organizations. Newsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded, and they may be prohibited from attending or publishing information about trials if such restrictions are necessary to assure a defendant a fair trial before an impartial tribunal. In *Sheppard v. Maxwell,* 384 U.S. 333 [86 S.Ct. 1507, 16 L.Ed.2d 600] (1966), for example, the Court reversed a state court conviction where the trial court failed to adopt "stricter rules governing the use of the courtroom by newsmen, as Sheppard's counsel requested," neglected to insulate witnesses from the press, and made no "effort to control the release of leads, information, and gossip to the press by police officers, witnesses, and the counsel for both sides." *Id.,* at 358, 359 [86 S.Ct. at 1519, 1520]. "[T]he trial court might well have proscribed extrajudicial statements by any lawyer, party, witness, or court official which divulged prejudicial matters." *Id.,* at 361 [86 S.Ct. at 1521]. See also *Estes v. Texas,* 381 U.S. 532, 539–540 [85 S.Ct. 1628, 1631, 14 L.Ed.2d 543] (1965); *Rideau v. Louisiana,* 373 U.S. 723, 726 [83 S.Ct. 1417, 1419, 10 L.Ed.2d 663] (1963).

See also, *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), and *Saxbe v. Washington Post,* 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 495 (1974).

■ It is also elementary that the First Amendment confers no right on news reporters to inquire into the private conference of the Supreme Court and the private communications between its justices, law clerks and other court personnel. The same is true as to such conferences between other Article III judges and their staffs. Basically, these courts and judges speak through their official records and are not obligated to grant press interviews.

It was and is also the deepest concern of this Court to protect its orderly processes and to protect jurors from both harassment and undue influences in all cases including this one. It is very tempting, especially considering the extreme time constraints that are present here, to be oversimplistic both with regard to the exercise of judicial power and with the exercise of First Amendment free speech and free press rights.

Nothing that this Court said and did to this jury was ever intended to inhibit the jurors right, post-trial and away from the court house, to initiate or volunteer statements regarding the trial to the press or to the public.

There was and is very respectable authority within the federal judiciary which manifests a broad reading of federal judicial power in regard to regulating post-verdict communication with jurors.

The interplay between the ideas of prior restraint under the First Amendment and the exercise of judicial power in this context was considered in *United States v. Sherman,* 581 F.2d 1358 (9th Cir. 1978). An earlier case in that circuit was *Bryson v. U. S.,* 238 F.2d 657 (9th Cir. 1956), which appears to be in the same vein as *Miller* and *Crosby* and which was neither discussed, limited or overruled explicitly in *Sherman.*

*Sherman* is certainly a significant current authority in regard to this problem. It was not authority for this Court to permit a reporter to attempt to intervene in the process of taking the verdict in this case. It is categorically authority that that reporter at that time and indeed the petition-

er news gathering organizations, at that time, did not have standing to complain about the Court's order at that time. *Sherman* was not and is not now a binding precedent on this Court although it deserves respect as a persuasive authority. It did grant to these news gathering organization the standing to do precisely what it did in this case, namely, to file for a mandate in the Court of Appeals. And given the record above cited there is no question that there is now practical standing by these petitioners to raise the First Amendment issue in this case. It must also be said that the standing authority is not all one way in accord with *Sherman.* See, *Central South Carolina Chapter, etc. v. Martin,* 431 F.Supp. 1182 (D.S.C.1977), *aff'd,* 556 F.2d 706 (4th Cir. 1977). Compare, *CBS v. Young,* 522 F.2d 234 (6th Cir. 1975) [6].

It is also basic to note that we are here dealing with the First Amendment press rights in the context of a judicial body whose most important processes are historically and constitutionally private. To compare a jury to a legislative council or administrative agency is to totally misconstrue its basic nature.

 It is also certainly correct that as a general proposition the court cannot assert a juror's privacy post-verdict. This Court had absolutely no intention of attempting to do so.

 It is also correct that a judge can discourage jurors from communicating about the contents of juror deliberations without ordering them to refrain from doing so. A distinguished Harvard law pro-

---

**6.** An interesting application of *Sherman* was made by the same court in *Wheeler v. U. S.,* 640 F.2d 1116 (9th Cir. 1981). At page 1123 the 9th Circuit stated:

> The trial court's inherent power to protect the sound administration of justice has provided the basis for orders issued to protect jurors after the trial has ended. *King v. United States,* 576 F.2d 432 (2d Cir. 1978) (court upheld order requiring jurors to report to FBI if anyone questioned them); *Bryson v. United States,* 238 F.2d 657 (9th Cir. 1956)

(order prohibiting defendant from communicating with jurors upheld). *Cf. United States v. Sherman,* 581 F.2d 1358 (9th Cir. 1978) (order that no one, including newsmen, speak with jurors struck down as unjustified because no showing that jurors would be harassed). It is possible, in a particular situation, that a trial court would be warranted in issuing an order to protect a witness, like a juror, even though the trial was over.

> It is interesting to note that in 1981 the 9th Circuit cited *Bryson* as authority.

fessor, Charles Nesson, has been quoted to that effect in the aforesaid *Time* magazine article.

■ Given the above authorities and the status of the record in this case and conceding without deciding that the *Sherman* decision is authoritative, the oral order of this Court made upon the receipt of the verdict may arguably have conflicted with First Amendment values. In order to give appropriate deference to these values it is desirable, if not mandatory, to rework the order in a more limited fashion. Specifically, the words "all others" should be here deleted from the oral orders issued at 12:25 P.M. and at 8:55 P.M. on August 17, 1982.

This Court has the deepest respect for the values that inhere in the First Amendment. This Court is also accutely aware of the scope of and the limitations on its judicial power under Article III of the Constitution of the United States. The oral order made was intended to be an appropriate exercise of the latter without infringing upon the former.

In that context the order of this Court is now modified as follows:

1. No post-verdict interrogation shall be permitted by anyone of any juror in this case on the premises of the United States Court House at 204 South Main Street, South Bend, Indiana.

2. All counsel and parties to this case are permanently enjoined from attempting to interrogate the members of this jury subsequent to its verdict.

3. It shall be and remain the exclusive private decision of the members of this jury panel as to whether or not they desire to be interviewed regarding this trial by members of the press and the public.

■ 4. Any conduct by anyone which constitutes harassment of any member of this jury panel in regard to such interviews will be handled appropriately by this Court.

The Clerk is ordered to immediately transmit the transcripts of the aforesaid hearing, including this proceeding, and to transmit this written order to the Clerk of the United States Court of Appeals for the Seventh Circuit.

IT IS SO ORDERED.

Judge Allen Sharp:—

While I respect the court's authority to conduct the business of the court in the courtroom, I am compelled to object to any order from the bench enjoining me from exercising my First Amendment right to talk to a juror or all jurors once they are released from this trial.

Furthermore, I object to a strict admonition to jurors to not speak freely once their duties in this trial are ended.

I would appreciate the record showing this.

Respectfully,

Jeffrey S. Stirson

Jeffrey S. Stirson, correspondent
Indianapolis Bureau Gannett News Service.